J-A18007-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| SCIARRETTI SITE DEVELOPMENT & PAVING COMPANY, INC. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MOON TOYOTA PARTNERS, LP. | : | |
| | : | No. 169 WDA 2023 |
| Appellant | : | |

Appeal from the Judgment Entered June 7, 2022
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD13007732

BEFORE: BENDER, P.J.E., LAZARUS, J., and KUNSELMAN, J.

MEMORANDUM BY BENDER, P.J.E.: **FILED: March 25, 2024**

Appellant, Moon Toyota Partners, LP., appeals from the June 7, 2022 judgment entered in the amount of $248,197.62, in favor of Appellee, Sciarretti Site Development & Paving Company, Inc. ("Sciarretti").[1] We affirm.

**I.**

The trial court conveyed the underlying facts, which were adduced at a non-jury trial, as follows:

---

[1] Sciarretti filed a praecipe to enter judgment on June 3, 2022, but Pa.R.Civ.P. 236 notice of the judgment was not provided until June 7, 2022. *See* Pa.R.A.P. 108(b) ("The date of entry of an order in a matter subject to the Pennsylvania Rules of Civil Procedure shall be the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.Civ.P. 236(b)."); Pa.R.Civ.P. 236(b) (directing that the prothonotary shall note in the docket the giving of written notice to each party's attorney of record).

The parties entered into a contract on February 24, 2011[,] where [Appellant] hired Sciarretti to provide site development and preparation services for the construction of its new car dealership located in Moon Township, Allegheny County[,] for a total price of $1,260,000.00. The parties agreed that Sciarretti would provide the site development and preparation services in three phases. Phase I included demolition of existing buildings. Phase II included site grading and excavation, grubbing and tree removal, digging test pits, removing unsuitable soil up to 3,335 cubic yards in the land fill dump area, implementing and maintaining soil erosion measures, installing storm sewers, installing sanitary sewer and water lines, installing site utilities within 5 feet of [the] building, installing site concrete including sidewalks, handicap ramps, light pole bases, curbs, pads, and installing a Redi-rock retaining wall along the northern property line. Phase III included paving of all parking lots and roadways with asphalt along with traffic signage and painting. The contract provided for the completion of Phase I and most of Phase II up to "pad ready" [—]meaning ready for another contractor to begin the new building construction[ —] by May 2, 2011, with the balance of Phase II to be completed by June 14, 2011[,] excluding site concrete. Phase III and all other work was to be completed by September 5, 2011. Sciarretti was not responsible for the construction of the building[,] which was to occur before Sciarretti was to resume work and complete Phase III. The parties agreed upon an estimated duration of approximately seven (7) months[,] beginning in February 2011 to September 2011. This schedule was supplemented by Sciarretti's Tentative Duration Schedule Goals on March 1, 2011.

Prior to entering into the contract, Sciarretti was aware that a portion of the site had been used as a landfill waste dump and an indeterminate amount of unsuitable material was located on the site. The contract specifically provided for the digging of test pits in this area and required Sciarretti to remove 3,335 cubic yards of the unsuitable material. The parties further agreed that Sciarretti would receive additional payments for removal of unsuitable materials that exceeded the 3,335 cubic yards maximum amount. The contract also contained a rock clause, that was inserted at the insistence of Sciarretti, permitting the contractor to seek an equitable adjustment of the contract price in the event that rock was encountered during the excavation.

Sciarretti commenced Phase I on February 24, 2011, which included mobilization of equipment and employees and building

demolition which was performed by a subcontractor. The demolition work included the removal of a small motel and a tint shop near the front of the property close to the main road. Demolition work was substantially completed on schedule except for the tint shop, which did not impede Sciarretti's progress with its critical path activities of Phase I or Phase II.

Sciarretti began Phase II work including tree removal and grubbing by a subcontractor with the assistance of some of Sciarretti's crew at or near the time of completion of Phase [I]. Simultaneously, Sciarretti also started to erect the silt fence to comply with the soil and erosion plan and remove and stockpile the topsoil. In March 2011, prior to the start of the site grading and excavation, test pits were dug in the old land fill portion and upon examination, the parties agreed that there was more unsuitable material than initially anticipated. The actual unsuitable material found was 12,000 to 15,000 cubic yards, significantly more than the 3,335 cubic yards provided for in the contract. In an attempt to reduce costs, [Appellant] made plans to use as much of the unsuitable material as possible and made arrangements with the adjoi.ning [*sic*] property owner, the Allegheny County Port Authority, to dump the remainder of the waste material on their property. Rather than hauling the unsuitable material off site to another landfill, [Appellant] had instructed Sciarretti to pile it in the northwest corner of the site, let it dry out and then separate the garbage from the useable soil and wait until [Appellant] obtained the necessary authorization to … haul [the] garbage to the adjoining Port Authority property. The digging of the test pits also revealed water in the area of the old landfill requiring the installation of a drainage system and the relocation of a drainage tank that had not been contemplated in the original plans.

Sciarretti was approximately midway on the final[,] ten-foot bench cut for the landfill drainage system when they hit rock on May 25, 2011[,] in the area of the building pad. Sciarretti promptly notified [Appellant] and the site engineer. The engineer at Gateway Engineer[s[2]] testified that the rock was massive and "looked like an ocean with ripples on it." It is undisputed that the rock mass encompassed 90% of the building's footprint and required the base level to be lowered, delaying the project.

---

[2] Gateway Engineers was the civil engineer on the project and made the plans. ***See*** N.T. Trial, 11/12/19-11/20/19, at 72.

Approximately a week later the parties met to discuss solutions to the rock issue, and everyone agreed with Sciarretti's suggestion to proceed with using a rock crusher on site and use the crushed rock for fill. Sciarretti permitted [Appellant] to contract directly with the rock crusher subcontractor, and his men and equipment did all the other work with the rock removal[,] except for putting the rock into the crusher. Sciarretti was paid extra for all its work and equipment used in the rock removal. The rock removal and additional work it created took an additional three and [a] half months. Phase II was not completed and pad ready until approximately September 7, 2011.

Work on the construction of the building started on September 22, 2011[,] and was completed on April 3, 2012. Construction of the building took six and [a] half months to complete and not the four allotted for in the contract and Sciarretti's Tentative Duration Schedule Goals. During the construction of the building, Sciarretti did not demobilize and continued to work at the site spreading topsoil, finishing the grading of the parking lots[,] and installing utilities. Also, during the construction of the building, additional rain leaders w[ere] added which were not part of the original plan and not connected to the storm sewer system. The building contractor ran these extra rain leaders across the southern parking lot area depositing excessive water on this portion of the parking area. Contamination and damage to the subbase in this area of the parking lot was caused by the building contractor's operating their heavy equipment over the saturated and muddy parking lot. The delay in the construction of the building for two and [a] half months denied Sciarretti access to areas around the building and prevented them from completing their work in this area of the project.

A portion of the retaining Redi-Wall had to be removed and reconstructed after being built in the wrong location due to faulty engineering plans. This work was completed during the winter months when the building was still under construction. Sciarretti was paid extra for this by Gateway [Engineers] and this was not part of Sciarretti's delay claim.

There were also delays with the installation of the sidewalks and ramps at the corner of University Boulevard and Port Authority Way due to the initial design flaws with the handicap ramps that w[ere] not compliant with PennDOT requirements and the improper placement of signage. These flaws required a portion of the sidewalk and ramp to be removed and redone. The initial

- 4 -

sidewalk plans were provided to Sciarretti in August 2011, but they lacked sufficient detail on the construction of the handicap ramp and Sciarretti was told he could not proceed. Approximately nine months later, the corrected and approved plans were provided to Sciarretti on May 18,[ ]2012.

There was a two-and-a-half-month delay in the completion of the construction of the building because [Appellant] had made changes to the building's location and added an extra garage door. This required design changes to the sidewalk surrounding the building including the grade, the location of the expansion joints[,] and the lowering of the inset lighting. Sciarretti was provided the revised plans on April 25, 2012[,] but the plans did not provide the new elevation for the grade and height of the curbs. This change required Sciarretti to hire a surveyor to obtain the proper heights at its cost and created a delay in the installation of the building sidewalks and curbs. The window/glass and signage subcontractors['] work on the building also delayed Sciarretti's installation of the building sidewalks. Since all three contractors were working in the same limited area, Sciarretti had to wait until the glass and signage was installed before they could complete the work on the sidewalk.

The record is clear that [Appellant's] construction managers and owners were slow to respond to Sciarretti's request for directions and additional drawings for changes made by [Appellant] to its original plans. This was particularly evident on the concrete portion of the job, including the sidewalks, ramps, curbs and the installation of parking lot light pole bases.

### Sciarretti's Claims under the Contractor and Subcontractor Payment Act ("CASPA"[)³]

---

³ *See* 73 P.S. § 501 *et seq*. This Court has described that:

CASPA is a comprehensive statute enacted in 1994 to cure abuses within the building industry involving payments due from owners to contractors, contractors to subcontractors, and subcontractors to other subcontractors. The underlying purpose of CASPA is to protect contractors and subcontractors and to encourage fair dealing among parties to a construction contract. The statute provides rules and deadlines to ensure prompt payments, to discourage unreasonable withholding of payments, and to address

*(Footnote Continued Next Page)*

On October 7, 2012, Sciarretti submitted what it believed to be the balance of its remaining[,] uncontested unpaid items under the base contract in the amount of $105,835.58. After the parties went back and forth regarding what [Appellant] claimed for back charges, it remitted a check in the amount of $60,186.70[,] withholding payment of $45,648.88. Sciarretti claims that the retention was without any substantiated basis since [Appellant] failed to provide documentation. At trial, Sciarretti admitted that [Appellant] was entitled to a $2,012.70 credit and it was owed $43,636.49.

In addition, Sciarretti claims that it is owed $6,998.10 for the extra costs incurred in the installation of the outside drop of the sanitary sewer system required by Moon Township Sewage Authority, which was not part of the original plan. The initial and first revised plans called for an inside drop into an existing municipal manhole. Due to the location of existing utilities changing the elevation and drop, Sciarretti was unable to utilize the existing manhole pipe for an inside drop and was required by the municipality to construct an outside drop connection to be code compliant. Sciarretti claims that this was outside of the scope of the original and first revised plans and submitted a change order and is entitled to be paid for the extra time and costs incurred.

Sciarretti's other remaining contractual claim was for a $15,365.50 increase in the asphalt index due to the delay of ten months for the installation of the asphalt parking lots and roadways. The original contract's asphalt pricing was based on 2011 prices which was the season the asphalt was to be laid. Due to construction delays that were not the fault of Sciarretti, the asphalt was not installed until 2012. The cost of asphalt had gone up in price[,] and the $15,365[.]50 represents its additional cost for material above the original base contract.

---

the matter of progress payments and retainages. Under circumstances prescribed in the statute, interest, penalties, attorney's fees, and litigation expenses may be imposed on an owner, contractor, or subcontractor who fails to make payment to a contractor or subcontractor in compliance with the statute.

***El-Gharbaoui v. Ajayi***, 260 A.3d 944, 954 (Pa. Super. 2021) (cleaned up).

Trial Court Opinion ("TCO I"), 11/13/22, at 2-8 (unpaginated; internal citations omitted).

On May 1, 2013, Sciarretti filed an action against Appellant, alleging breach of contract-delay and inefficiency costs, breach of contract-failure to pay, and violations of CASPA. A seven-day bench trial took place from November 12th through 20th of 2019, at which the parties introduced over 200 trial exhibits. *See id.* at 2 n.1 (trial court's noting that "the voluminous record in this case included a transcript of 1,281 pages … along with over 200 trial exhibits") (unpaginated). Following the conclusion of trial, both parties filed their proposed findings of fact and conclusions of law, as well as responses to each other's submissions. On November 16, 2020, the trial court filed its findings of fact and conclusions of law, along with a non-jury verdict in favor of Sciarretti. Specifically, the trial court awarded Sciarretti delay damages in the amount of $104,361.00, and damages in the amount of $43,636.49 for the balance of the retainage, $6,998.10 for the additional costs associated with the outside sewage drop box, and $15,365.50 for the increase in the cost

of asphalt.[4, 5] The trial court ordered that interest and attorney fee claims pursuant to CASPA should be brought by post-trial motion.

Both parties filed post-trial motions, and the trial court ordered that an evidentiary hearing take place limited to Sciarretti's claims under CASPA for interest, penalty interest, attorneys' fees, and costs. The trial court held the evidentiary hearing on November 17, 2021, at which more exhibits were introduced.[6] Thereafter, the trial court filed supplemental findings of fact and conclusions of law, in which it re-affirmed its previous findings in favor of Sciarretti. It also awarded Sciarretti $77,836.53 in interest and attorneys' fees under CASPA. On January 20, 2022, the trial court filed an amended non-jury verdict to reflect its additional findings.

Appellant filed a supplemental post-trial motion to the amended verdict, which the trial court subsequently denied. Nevertheless, on February 17,

---

[4] We note that Sciarretti sought delay damages in excess of $1.2 million. N.T. at 634 (Sciarretti's expert's opining that the total damages incurred by Sciarretti from the delays equates to $1,287,430.01). However, the trial court awarded much less to Sciarretti, after finding that delays caused by the rock, unsuitable materials, and excessive rainfall in spring of 2011 were not the fault of either party and not the basis of a delay claim. TCO I at 11-13 (unpaginated). **See also** Sciarretti's Brief at 11 ("[W]hile [Sciarretti] sought damages arising from ten (10) months of delay, the [l]ower [c]ourt reduced the delay claim to only two (2) months as a result of impacts not caused by Appellant.").

[5] The trial court's November 13, 2020 non-jury verdict did not indicate that Sciarretti's claims for the outside drop box and increase in asphalt cost fell under CASPA.

[6] At this hearing, Appellant — for the first time — introduced evidence as to why it withheld payment from Sciarretti.

2022, the trial court filed a second amended non-jury verdict to clarify that the outside sewage drop box and asphalt claims were CASPA claims, in addition to Sciarretti's $43,636.49 retention claim. On June 3, 2022, Sciarretti filed a praecipe to enter judgment, and judgment in the amount of $248,197.62 was entered against Appellant on June 7, 2022. Appellant timely filed a notice of appeal, and complied with the trial court's instruction to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).[7] The trial court thereafter issued a Rule 1925(a) opinion.

Before Appellant filed its appellate brief, on March 15, 2023, it filed an application to correct the record on appeal pursuant to Pa.R.A.P. 1926 with this Court. **See** Appellant's Rule 1926 Application to Correct the Record on Appeal and For Extension of Time (First) to File Appellant's Brief, 3/15/23.[8]

_____

[7] Because Appellant stated that it did not receive the trial court's order directing it to file a concise statement, the trial court permitted Appellant to file its concise statement *nunc pro tunc*.

[8] Rule 1926 provides, in relevant part:

> (a) If any difference arises as to whether the record truly discloses what occurred in the trial court, the difference shall be submitted to and settled by that court after notice to the parties and opportunity for objection, and the record made to conform to the truth.

> (b) If anything material to a party is omitted from the record by error, breakdown in processes of the court, or accident or is misstated therein, the omission or misstatement may be corrected by the following means:

> (1) by the trial court or the appellate court upon application or on its own initiative at any time; in the event of correction or

*(Footnote Continued Next Page)*

In Appellant's application, it stated, *inter alia*, that it "carefully reviewed the trial court's Record Inventory List to ensure it contained all documents necessary to address the issues raised on appeal[,]" and "determined that the Record Inventory was deficient in that it did not contain the parties' [t]rial [e]xhibits, many of which are implicated in this appeal." **Id.** at ¶¶ 3, 4. Appellant explained that, "[o]n March 3, 2023, Appellant contacted the trial court and was informed that the trial exhibits were inadvertently omitted from the record." **Id.** at ¶ 5. Appellant asserted that, "[d]ue to error, breakdown in processes of the court and/or accident, the trial court has not yet supplemented the record with the parties' trial exhibits[,]" and that "there appears to be some confusion in the trial court as to whether it is Appellant's obligation to retrieve and deliver the trial exhibits to the Superior Court for inclusion in the record." **Id.** at ¶¶ 6, 7. Consequently, pursuant to Rule

_____

modification by the trial court, that court shall direct that a supplemental record be certified and transmitted if necessary; or

(2) by the parties by stipulation filed in the trial court, in which case, if the trial court clerk has already certified the record, the parties shall file in the appellate court a copy of any stipulation filed pursuant to this rule, and the trial court clerk shall certify and transmit as a supplemental record the materials described in the stipulation.

(c) The trial court clerk shall transmit any supplemental record required by this rule within 14 days of the order or stipulation that requires it.

(d) All other questions as to the form and content of the record shall be presented to the appellate court.

Pa.R.A.P. 1926.

1926(b)(1), Appellant requested that this Court enter an order directing the trial court to certify and submit the parties' trial exhibits as a supplemental record. *Id.* at ¶ 8.

Thereafter, on April 6, 2023, this Court entered a *per curiam* order, in which we, among other things, denied without prejudice Appellant's application to correct the record. Specifically, we stated that Appellant's "application to correct is **DENIED without prejudice** to Appellant to file an application for relief with the trial court pursuant to Pa.R.A.P. 1926(a) (stating that differences as to contents of the trial court record be submitted to trial court)." Order, 4/6/23 (single page; emphasis in original).

A few weeks later, on April 26, 2023, Appellant filed its appellate brief, raising the following issues for our review, which we have re-ordered for ease of disposition:

> I. Whether the trial court committed an error of law in returning a non[-]jury verdict in favor of Sciarretti for contract funds withheld by the owner out of the retention, under circumstances in which Sciar[r]etti failed to meet the burden of proof to show that the amounts in question were properly due and payable, or were properly withheld by the owner because either work was deleted or the work was performed but was deficient?
>
> II. Whether Sciarretti failed in its burden of proving any period of delay attributable solely to [Appellant] that is quantifiable in any particular number of days, such that the award of damages for sixty (60) days of compensable delay is not founded on the evidence?
>
> III. Whether the trial court erred as a matter of law in its amended non-jury verdict, entered on January [20], 2022, by awarding statutory interest under the provisions of [CASPA] ancillary to the award of damages for the outside (sewage) drop connection (box) and the increase in the price of asphalt, when those items of

- 11 -

Sciarretti's claims are not properly cognizable under the provisions of CASPA?

IV. Whether the trial court committed an error of law in calculating the award of interest due under CASPA, particularly as it relates to including interest accrued after the non-jury verdict rendered on November 13, 2020, and impermissibly calculated interest through January 30, 2022?

Appellant's Brief at 5-6 (unnecessary capitalization omitted).

Along with its brief, on April 26, 2023, Appellant filed a reproduced record. The table of contents for the reproduced record shows that it contains 28 trial exhibits, which is only a small fraction of the exhibits purportedly introduced below. *See* TCO I at 2 n.1 (trial court's noting that there were over 200 trial exhibits) (unpaginated). Thereafter, Sciarretti filed a brief, Appellant submitted a reply, and oral argument took place. While this appeal has been pending, however, this Court has not received a supplemental record containing exhibits from trial or the November 17, 2021 hearing.

**II.**

Consequently, prior to delving into Appellant's issues, we must address the state of the certified record before us. This Court was never informed of what transpired below following our April 6, 2023 order directing Appellant to file an application for relief in the trial court to correct the record. Since that time, the parties have filed nothing further in this Court regarding the record and, as previously mentioned, we received no supplemental record containing exhibits. After no supplemental record containing exhibits was transmitted to this Court, we conducted an informal inquiry and learned that filings pertaining to the record had been made below following our April 6, 2023 order. We

asked the trial court to send us these filings as a supplemental record, and it did so on February 12, 2024.

A review of the filings in the supplemental record reveals the following. On April 11, 2023, pursuant to Rule 1926, Appellant filed an application to correct the record on appeal with the trial court. Appellant again pointed out that "the Record Inventory was deficient in that it did not contain the parties' [t]rial [e]xhibits, many of which are implicated in this appeal." Appellant's Rule 1926 Application to Correct, 4/11/23, at ¶ 3. Appellant therefore requested that, pursuant to Rule 1926(b)(1), the trial court certify and submit the parties' trial exhibits to the Superior Court as a supplemental record at the trial court's earliest convenience. *Id.* at ¶ 6.

On April 17, 2023, the trial court issued an order denying in part and granting in part Appellant's request. In its order, the trial court stated the following in relevant part:

> AND NOW, this 17th day of April 2023, after review of [Appellant's] Rule 1926 Application to Correct Record on Appeal, it is ORDERED, ADJUDGED, and DECREED, that [Appellant's] Application is DENIED in part as to Pa.R.A.P. 1926(b)(1) and GRANTED in part under Pa.R.A.P. 1926(b)(2).
>
> Under Pa.R.A.P. 1926(b)(2), the parties shall file exhibit stipulations within ten (10) days from the date of this order and notify my staff at the below emails once filed. Once the stipulations are filed with [the Department of Court Records], they will be certified and transmitted as a supplemental record in accordance with the filed stipulations. The parties also will have to file their stipulations in the Superior Court as required by Pa.R.A.P. 1926(b)(2).
>
> I am unable to transmit the copy of exhibits that I was provided as requested in [Appellant's] Application under Pa.R.A.P.

- 13 -

1926(b)(1) because there are notations that were made by me on the exhibits.

Order, 4/17/23, at 1 (unpaginated; capitalization in original).

Subsequently, on April 26, 2023, the parties filed a stipulation in the trial court entitled, "Stipulation Governing the Reproduced Record Pursuant to [Pa.]R.A.P. 1926(b)(2)[.]" Stipulation, 4/26/23, at 2 (unpaginated). The stipulation states the following:

> NOW COMES … Sciarretti…, by and through its undersigned counsel, and comes [Appellant], by and through its undersigned counsel, and pursuant to this [c]ourt's April 1[7], 2023 Order and Rule 1926(b)(2) of the Pennsylvania Rules of Appellate Procedure, hereby stipulate that the materials attached hereto shall constitute the agreed-upon Reproduced Record in the captioned matter.

*Id.* The parties attached to the stipulation the reproduced record filed with this Court on April 26, 2023.

It is well-established that "[i]t is the obligation of the appellant to make sure that the record forwarded to an appellate court contains those documents necessary to allow a complete and judicious assessment of the issues raised on appeal." *Commonwealth v. Shreffler*, 249 A.3d 575, 584 (Pa. Super. 2021) (citations omitted). "Our law is unequivocal that the responsibility rests upon the appellant to ensure that the record certified on appeal is complete in the sense that it contains all of the materials necessary for the reviewing court to perform its duty." *Commonwealth v. Preston*, 904 A.2d 1, 7 (Pa. Super. 2006) (citation omitted). This Court has previously explained that it "cannot meaningfully review claims raised on appeal unless we are provided with a full and complete certified record. … In the absence of an adequate

- 14 -

certified record, there is no support for an appellant's arguments and, thus, there is no basis on which relief could be granted." ***Id.*** (citation omitted).

Here, Appellant noticed that the exhibits were missing from the certified record transmitted on appeal and sought supplementation of the record, first in our Court and then below. However, in attempting to supplement the record below, multiple errors occurred.

First, in the trial court's April 17, 2023 order directing the parties to file exhibit stipulations pursuant to Rule 1926(b)(2), the trial court specifically pointed out that the parties would have to file their stipulation in this Court. ***See*** Order, 4/17/23, at 1 ("The parties also will have to file their stipulations in the Superior Court as required by Pa.R.A.P. 1926(b)(2).") (unpaginated). Rule 1926(b)(2) explicitly directs the parties to file a copy of the stipulation in this Court. ***See*** Pa.R.A.P. 1926(b)(2) (stating that the parties can correct the record "by stipulation filed in the trial court, in which case, if the trial court clerk has already certified the record, ***the parties shall file in the appellate court a copy of any stipulation filed pursuant to this rule***, and the trial court clerk shall certify and transmit as a supplemental record the materials described in the stipulation") (emphasis added). Nevertheless, the parties did not file a copy of the stipulation in this Court.[9]

_____

[9] We acknowledge that the Department of Court Records also failed to transmit a supplemental record to us upon the filing of the stipulation in accordance with Rule 1926 and the trial court's order. ***See*** Pa.R.A.P. 1926(b)(2), ***supra***; Pa.R.A.P. 1926(c) ("The trial court clerk shall transmit any supplemental
*(Footnote Continued Next Page)*

Second, the parties entered a stipulation governing **the reproduced record**. Specifically, they agreed that the materials attached to the stipulation would constitute the reproduced record in the matter. As the stipulation pertains to the reproduced record, it does not address correcting or supplementing the certified record.

Finally, and most critically, the materials attached to the parties' stipulation are the same materials included in the reproduced record filed in this Court.[10] This means that it encompasses only a small fraction of the exhibits that were introduced below and considered by the trial court.[11] As such, we do not have a full and complete record before us.

_____

record required by this rule within 14 days of the order or stipulation that requires it."); Order, 4/17/23, at 1 ("Once the stipulations are filed with [the Department of Court Records], they will be certified and transmitted as a supplemental record in accordance with the filed stipulations.") (unpaginated). However, we reiterate that it is the appellant's responsibility to ensure that the reviewing court has all the materials necessary to perform its duty. **Preston**, 904 A.2d at 7. Here, it appears that Appellant never checked the appellate docket to see if a transmittal of a supplemental record occurred. Further, the Department of Court Records may have been confused on whether it should transmit a supplemental record, given that the stipulation addresses the reproduced record, not the certified record.

[10] The materials attached to the stipulation also include things besides exhibits, such as parts of the transcript and the trial court's findings of fact and conclusions of law. This inclusion of other materials contravenes the trial court's order directing the parties to file **exhibit** stipulations. Order, 4/17/23, at 1 ("Under Pa.R.A.P. 1926(b)(2), the parties shall file exhibit stipulations....") (unpaginated).

[11] To the extent that the trial court wrote on the copy of the exhibits it was provided, there is no indication that Appellant sought to have the trial court redact its notes or fashion some other relief.

The foregoing errors are troublesome, and we express our displeasure that this Court has had to spend considerable time and effort trying to unravel what occurred below following our April 6, 2023 order. Nevertheless, to the extent we are able, given the limited record before us, we proceed to review the questions Appellant raises on appeal.

**III.**

Issue 1

In Appellant's first issue, it argues that the trial court erred as a matter of law in finding that Appellant violated CASPA because Sciarretti did not prove that Appellant breached the contract by failing to pay Sciarretti for work Sciarretti satisfactorily performed. Appellant's Brief at 26. To prevail, Appellant contends that Sciarretti had to show that Appellant "breached the contract by proving, (a) while Sciarretti complied with all preconditions to payment, [Appellant] nevertheless (b) failed in its contractual duty to pay Sciarretti for work Sciarretti satisfactorily performed in accordance with the [c]ontract, (c) resulting in damages." *Id.* at 27. To support its argument, Appellant says that Sciarretti admitted it never satisfied a necessary precondition to payment, namely providing as-built drawings, *id.* at 28, and failed to prove that, for seven disputed items, it had performed the work satisfactorily but had not been paid, *id.* at 29.

Initially, our scope and standard of review in this matter is

> limited to a determination of whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law.

- 17 -

Findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as a verdict of a jury and will not be disturbed on appeal absent error of law or abuse of discretion. When this Court reviews the findings of the trial judge, the evidence is viewed in the light most favorable to the victorious party below and all evidence and proper inferences favorable to that party must be taken as true and all unfavorable inferences rejected.

As with all questions of law, our review is plenary.

***Beckwith Machinery Co. v. National Union Fire Ins. Co. of Pittsburgh***, 890 A.2d 403, 405-06 (Pa. Super. 2005) (cleaned up).

Further, we recognize that:

By its terms, CASPA applies to construction contracts. One must first establish a contractual right to payment pursuant to either a written or oral contract, and breach of that contract, to be entitled to CASPA relief. Thus, the construction contract is the starting point of any CASPA analysis. CASPA does not supplant the traditional breach of contract action between contracting parties; it merely makes additional remedies available to contractors and subcontractors when they are not promptly paid by the party with which they contracted.

***See Scungio Borst & Associates v. 410 Shurs Lane Developers, LLC***, 106 A.3d 103, 109 (Pa. Super. 2014) (*en banc*) (citations omitted); ***see also*** 73 P.S. § 504 ("Performance by a contractor or a subcontractor in accordance with the provisions of a contract shall entitle the contractor or subcontractor to payment from the party with whom the contractor or subcontractor has contracted."). To prove a breach of contract, one must show "(1) existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." ***CoreStates Bank, N.A. v. Cutillo***, 723 A.2d 1053, 1058 (Pa. Super. 1999) (citation omitted).

Our review of the record shows that, at trial, Chris Sciarretti — who works for Sciarretti — discussed the contract entered into between Sciarretti and Appellant. ***See generally*** N.T. at 51-71 (generally discussing the contract). He outlined the work Sciarretti performed, ***see generally id.*** at 74-138, and relayed that Sciarretti submitted a final application for payment of the contract balance in the amount of $105,835.58 on October 7, 2012. ***Id.*** at 148-50. He explained that Appellant, in response, only issued a roughly $60,000.00 payment to Sciarretti. ***Id.*** When asked about Appellant's failure to pay Sciarretti the full amount Sciarretti believed it was owed under the contract, Mr. Sciarretti testified to the following:

> [Sciarretti's counsel:] Do you know why on a $105,835 payment application you only received payment of $60,000?
>
> [Mr. Sciarretti:] Because they took out some of the change orders.
>
> [Sciarretti's counsel:] Can you go to Exhibit 95?
>
> [Mr. Sciarretti:] Yes. Okay.
>
> [Sciarretti's counsel:] This is an e-mail from Mark Nous to Sciarretti?
>
> [Mr. Sciarretti:] Yes.
>
> [Sciarretti's counsel:] Who is Mark Nous?
>
> [Mr. Sciarretti:] I think he's their financial guy.
>
> [Sciarretti's counsel:] Does the attachment to this e-mail, does that explain the deductions down to $60,186?
>
> [Mr. Sciarretti:] Their version, yes.
>
> [Sciarretti's counsel:] It lists a number of things, correct?
>
> [Mr. Sciarretti:] That's correct.

[Sciarretti's counsel:] Do you agree … that they are entitled to a credit for removing 310 feet of concrete curbing around the building?

[Mr. Sciarretti:] I'd have to see it.

[Sciarretti's counsel:] Had you gotten any more detailed information other than what's on this piece of paper?

[Mr. Sciarretti:] No.

[Sciarretti's counsel:] Have you requested it?

[Mr. Sciarretti:] Yes.

[Sciarretti's counsel:] The next item there, $5,928 credit to change of three-inch bicycle grates on 24 … catch basins rather than ten-inch?

[Mr. Sciarretti:] I never specified three-inch, six-inch. When I bid the project, I knew that I had put grates on these catch basins. If the grates change, that's an industry standard too. That's usually somebody trying to create more fall or change the elevation, so I never specified what -- how many inches those things would be.

[Sciarretti's counsel:] Is it fair to say you put in what they asked for?

[Mr. Sciarretti:] Yes, it is.

[Sciarretti's counsel:] The next credit, $10,500 for 120 lineal feet less of storm water pipe and five catch basins?

[Mr. Sciarretti:] Again, I'd have no backup on any of those things.

[Sciarretti's counsel:] So do you agree with that?

[Mr. Sciarretti:] Do not.

[Sciarretti's counsel:] $7,000 credit owed for eliminating walking path?

[Mr. Sciarretti:] The walking trail was part of the landscaping package which was eliminated immediately upon acceptance of this contract. They snuck it back in on a note in the contract, and then further down in the note, it's eliminated again in the landscaping package being eliminated. It was never part of anything I owed them once they pulled the landscaping out.

[Sciarretti's counsel:] When you bid the project, you –- we saw earlier today breakdowns of particular work scopes?

[Mr. Sciarretti:] If you look at the landscaping, the walking trails is part of my landscaping package that they removed.

[Sciarretti's counsel:] And they removed the full amount of that?

[Mr. Sciarretti:] They removed the full amount of the landscaping package, yes.

[Sciarretti's counsel:] $2,012.39 for credit due for removal of concrete and adding paving at Port Authority Drive. Do you agree with that credit?

[Mr. Sciarretti:] Yeah. I agree with this one.

[Sciarretti's counsel:] Credit, $5,000 credit for bad concrete work around building. Do you agree with that?

[Mr. Sciarretti:] Absolutely not.

[Sciarretti's counsel:] Was any of your concrete work rejected?

[Mr. Sciarretti:] Yeah. There were some pads out around the sidewalk that did not meet the cross lift. We removed and replaced them within a week.

[Sciarretti's counsel:] $11,488.50 credit for removal of paving access road to cell tower? Do you agree with that?

[Mr. Sciarretti:] No.

[Sciarretti's counsel:] Was that installed?

[Mr. Sciarretti:] Yes.

*Id.* at 150-52.

On cross-examination, Appellant's counsel then questioned Mr. Sciarretti about Mr. Nous's email, as follows:

[Appellant's counsel:] So let's just start with one of the last items. Exhibit 95 was the e-mail from Mark Nous, the controller at Ross

- 21 -

Development,[12] in which he attached certain adds and deducts, getting from the $105,000 down to the 60 that they paid you; is that correct?

[Mr. Sciarretti:] Yes.

[Appellant's counsel:] Now, that $105,000 that you billed for, that was the retainage on the job, was it not?

[Mr. Sciarretti:] May have been, yes.

[Appellant's counsel:] So you're saying to Ross, pay me the remainder of the retainage because I'm done with the work, so to restate the question. You're saying to Ross, I'm done with the work; is that correct?

[Mr. Sciarretti:] Yes.

[Appellant's counsel:] You're saying, you're retaining $105,000 as the retainage; is that correct?

[Mr. Sciarretti:] Yes.

[Appellant's counsel:] And you billed for the full 105; is that correct?

[Mr. Sciarretti:] Yes.

[Appellant's counsel:] And they had certain adds and deducts attached to this Nous e-mail explaining why they thought they were entitled to retain $45,000 of the $105,000; is that correct?

[Mr. Sciarretti:] Yes.

[Appellant's counsel:] And your testimony here today when your counsel asked, you said, well, I didn't have enough information to evaluate some of these deducts, and he said, did you ask for it? And you testified that you did; is that correct?

[Mr. Sciarretti:] Could be.

[Appellant's counsel:] Could be. Well, let's get it straight. When you got this Exhibit 95, you got it, you looked at it; is that correct?

_____

[12] Ross Development Company served as the construction manager on the project. N.T. at 71.

- 22 -

[Mr. Sciarretti:] Counsel, I could have asked him over the telephone. It doesn't necessarily have to show up in a text message.

\*\*\*

[Appellant's counsel:] … You got the e-mail, you looked at it. Correct?

[Mr. Sciarretti:] Yes, that's correct.

[Appellant's counsel:] You saw items that you felt you needed more information for; is that correct?

[Mr. Sciarretti:] Yes, that's correct.

[Appellant's counsel:] Such as the deduct of the 310 feet of concrete; is that correct? That was one of them that you said you needed information on; is that right?

[Mr. Sciarretti:] Okay. Yes.

[Appellant's counsel:] Is that right?

[Mr. Sciarretti:] Sure.

[Appellant's counsel:] And your counsel asked and you testified that you asked for it; is that correct?

[Mr. Sciarretti:] That's correct.

[Appellant's counsel:] And who did you ask, sir?

[Mr. Sciarretti:] Could have easily been Mark. It could have been Tony, and it could have been Tim.[13]

[Appellant's counsel:] Could have been the man in the moon?

[Mr. Sciarretti:] Could have been the man on the moon.

[Appellant's counsel:] Who did you ask, sir, for that information?

---

[13] Along with Mr. Nous, these individuals also worked for Ross Development. *See* N.T. at 71 (Mr. Sciarretti's stating that Tony Ross was part of Ross Development); *id.* at 73 (stating that Tim Petrilla is Ross Development's on-site individual).

- 23 -

[Mr. Sciarretti:] I'm pretty sure I asked Tim Petrilla.

[Appellant's counsel:] You're sure.

[Mr. Sciarretti:] That's right.

[Appellant's counsel:] How did you do that?

[Mr. Sciarretti:] I could have said very simply that, hey, look, you guys are trying [t]o give me all these back charges, and I think you need to give me backup with them.

***

[Appellant's counsel:] Can you tell this [c]ourt when you asked, who you asked and how for the information that you've already testified under oath you asked for?

[Mr. Sciarretti:] No, I can't.

*Id.* at 155-58.

Based on our review of the trial transcript, Appellant's counsel did not ask Mr. Sciarretti anything more about any of the deductions, nor did Appellant present evidence countering Mr. Sciarretti's testimony as to the propriety of the deductions. Later in the trial, Appellant's counsel asked if Sciarretti provided as-built drawings, to which Mr. Sciarretti stated he did not believe it did. *Id.* at 349.

At the end of Sciarretti's case-in-chief, Appellant generally moved for a compulsory non-suit, but deferred any argument on it. *Id.* at 1154. After Appellant rested, Appellant generally moved for the entry of judgment, but again deferred any argument on it. *Id.* at 1202. The parties then gave closing arguments. In Appellant's closing, it argued, in relevant part:

What the adds and the deducts are – and there was very little testimony about it, and that's the point I'm going to get to. But what these are is, at the end of the day, retrospectively, the owner gets a billing to release the 105, looks at items of work that were

deleted and should be a credit, looks at change orders that had been submitted but for whatever reason the work wasn't done, takes the position that part of a change order for the administration cost of handling a rock problem, which I'll get to, it was billed in an excessive amount, and there are little adjustments. That's what the adds and deducts are.

The only evidence really on it was it was shown to Mr. Sciarretti. He went through it point by point, and he either said, I agree with it, it's right, which he did as to a few items, or he said, I don't have enough information to deal with it. And he was asked, did you ask for it? And he said, I did. And on cross I asked him, who did you ask and when, and he couldn't tell the [c]ourt who he asked, when he asked, or how he asked. … So they have the burden of proof. They didn't meet it. … [T]hat's really the only part of the case that there's any unanswered questions about.

*Id.* at 1216-17.

Following trial, the trial court concluded that "Sciarretti is entitled to be paid $43,636.49 being the balance owed on the application for final payment under the contract." TCO I at 15 (unpaginated). In doing so, it noted that Appellant "never disputed Sciarretti's CASPA claim to the balance of the retainage due under the contract." *Id.* (citation omitted). In its subsequent Rule 1925(a) opinion, it further elaborated:

First, my findings of fact are supported in the record by the preponderance of the evidence that [Appellant] breached the contract by not paying the balance of the retention funds in the amount of $43,636.49. My findings of fact[] are supported in the record by Mr. Sciarretti's testimony, whom I found to be a credible witness. He credibly testified that [Sciarretti] had sent [its] final application for payment of the retainage on October 7, 2012, in the amount of $105,835.68, which was 10% of the original contract amount. Mr. Sciarretti ultimately received a check for $60,000.00, and an email listing seven setoffs or back charges totaling approximately $45,000.00. Mr. Sciarretti further credibly testified to each of these back charges in which he refuted each one, except the back charge of $2,012.70 for the removal of concrete and the additional paving to Port Authority Drive with

which he agreed. Mr. Sciarretti credibly testified that he had requested additional information from [Appellant] regarding some of their setoffs, but [Appellant] failed to respond.

Specifically, Mr. Sciarretti testified that the back charges for the removal of 310 feet of curbing and 120 feet of storm water pipe and five fewer catch basins needed additional documentation from [Appellant] which was never provided. Regarding the bicycle grates set off, Mr. Sciarretti noted that [Appellant] is not entitled to any credits for the grates installed because the contract did not specify the size and the grates were installed to industry standards. Mr. Sciarretti testified that the walking path was part of the landscaping package which had been removed by [Appellant] in the original contract, and therefore, [Appellant] requested credit for work that Sciarretti was not contractually responsible for. Regarding the credit for poor concrete work, Mr. Sciarretti was emphatic that all substandard concrete work was removed and redone. Mr. Sciarretti also testified that the access road to the cell tower was installed and paved, and [Appellant's] request for $11,488.50 setoff was incorrect. I found Mr. Sciarretti's testimony credible which was supported and bolstered by his acceptance and admittance that one of the back charges was valid. I also found it telling that [Appellant] never provided any evidence or testimony disputing Sciarretti's CASPA claim to the balance of the retainage due under the contract during the initial seven-day trial. The evidence regarding the retainage under CASPA was uncontroverted. The record is clear that Sciarretti's CASPA claim was supported by the weight of the evidence, and on the retainage issue, [Appellant] did not present any compelling evidence to weigh.

Trial Court Opinion ("TCO II"), 8/19/22, at 5-6 (unpaginated; citation omitted).

Initially, upon review, Exhibit 95 — Mr. Nous's email — is not contained in the parties' stipulation. We reiterate that it is the appellant's responsibility to ensure that the record is complete for our review, and point out that it is not our job to scour the record to locate evidence. *See Shreffler*, 249 A.3d at 584 ("It is the obligation of the appellant to make sure that the record

- 26 -

forwarded to an appellate court contains those documents necessary to allow a complete and judicious assessment of the issues raised on appeal.") (citations omitted); ***Wallace v. State Farm Mutual Automobile Insurance Company***, 199 A.3d 1249, 1255 (Pa. Super. 2018) ("We shall not … scour the record to find evidence to support an argument….") (citation omitted). Nevertheless, we were able to locate Mr. Nous's email elsewhere in the certified record. **See** Complaint, 5/1/13, at Exhibit 2. **See also** Appellant's Pa.R.A.P. 1925(b) Statement, 7/7/22, at 2-3 (quoting from Mr. Nous's email).

Still, no relief is due on Appellant's first issue. First, with respect to Sciarretti's failure to provide as-built drawings, we deem Appellant's contention waived. Appellant improperly raised its argument about the as-built drawings for the first time in its "Response in Support of its Opposition to [Sciarretti's] Motion for Post-Trial Relief[,]" filed on March 29, 2021. **See** Pa.R.Civ.P. 227.1(b) (stating that "post-trial relief may not be granted unless the grounds therefor, … if then available, were raised in pre-trial proceedings or by motion, objection, point for charge, request for findings of fact or conclusions of law, offer of proof or other appropriate method at trial; and … are specified in the motion"); Appellant's Reply Brief 1 (stating that it raised this issue in "[Appellant's] Response in Support of its Opposition to [Sciarretti's] Motion for Post-Trial Relief Pursuant to Pa.R.Civ.P. 227.1") (italics omitted). In addition, Appellant did not specifically raise its claim pertaining to the as-built drawings in its Rule 1925(b) statement, and the trial court did not address it in its Rule 1925(a) opinion. **See** Pa.R.A.P.

1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with provisions of this paragraph (b)(4) are waived."); *see also* ***Greater Erie Indus. Development Corp. v. Presque Isle Downs, Inc.***, 88 A.3d 222, 225 (Pa. Super. 2014) ("[I]n determining whether an appellant has waived his issues on appeal based on non-compliance with Pa.R.A.P. 1925, it is the trial court's order that triggers an appellant's obligation[. T]herefore, we look first to the language of that order.") (citations omitted); Pa.R.A.P. 1925(b) Order, 6/13/22, at 1 (warning that "[a]ny issue not properly included in the Statement timely filed and served shall be deemed waived"). For the above-stated reasons, this aspect of Appellant's first issue is waived.[14]

Second, we agree with the trial court that, at trial, Appellant did not contest Mr. Sciarretti's testimony that, for four of the deductions, either (i)

---

[14] Even if not waived, the record does not indicate that Mr. Nous raised any complaint in his email that Sciarretti did not provide as-built drawings, and that Appellant was withholding payment on that basis. **See** 73 P.S. § 509(d) ("Withholding of retainage for longer than 30 days after final acceptance of the work shall be subject to the obligations imposed upon the owner, contractor or subcontractor in section 6(b) or 11(b).") (footnote omitted); 73 P.S. § 506(a) ("The owner may withhold payment for deficiency items according to the terms of the construction contract."); 73 P.S. § 506(b) (stating that, if an owner withholds payments, the owner shall "notify the contractor of the deficiency item by a written explanation of its good faith reason[,]" and that failure to comply "shall constitute a waiver of the basis to withhold payment and necessitate payment of the contractor in full for the invoice"). Further, despite Appellant's claim on appeal that Sciarretti's provision of as-built drawings was a necessary contractual prerequisite for Sciarretti's receiving **any** payment of the retainage, we point out that Appellant had previously paid Sciarretti a portion of the retainage, even though Sciarretti had provided it with no as-built drawings. **See** N.T. at 149-50.

Sciarretti sufficiently performed the work (namely, installed acceptable bicycle grates, fixed bad concrete work, and installed the paving access road), or (ii) the work had been removed from the contract (namely, the walking trail), such that Appellant was requesting credit for work Sciarretti was not responsible to complete. Mr. Sciarretti's assertions on these items went unchallenged by Appellant at trial, and the trial court was free to accept Mr. Sciarretti's testimony about them. **See Beckwith Machinery Co.**, **supra**. As such, no relief is due for these items.[15]

Finally, for the remaining disputed items (the concrete curbing, the storm water pipe, and the catch basins), the trial court credited Mr. Sciarretti's testimony that Appellant did not provide Sciarretti with support for these deductions, despite his requests for more information about them. Further, at trial, Mr. Sciarretti generally represented that Sciarretti had completed the contractual work and that Appellant owed it the full balance of the retainage. **See** N.T. at 148-50, 155-56. Appellant, in turn, proffered no evidence at trial refuting this assertion. As such, viewing the evidence in the light most favorable to Sciarretti as the verdict winner, the record supports that Sciarretti completed the work and Appellant owed Sciarretti payment for these items.

---

[15] Although the trial court permitted Appellant to present new testimony about these deductions at the November 17, 2021 evidentiary hearing, the trial court later indicated that it believed that Appellant should have disputed Sciarretti's claim to the balance of the retainage at trial. **See** TCO II at 5-6 (unpaginated), **supra**. As such, it appears that the trial court chose to disregard the testimony proffered by Appellant at the later evidentiary hearing. We see no error or abuse of discretion in this regard, as we agree that Appellant had the opportunity to present this evidence at trial and failed to do so.

*See Beckwith Machinery Co.*, *supra*. Accordingly, no relief is due for these items either.

Issue 2

In Appellant's second issue, it claims that Sciarretti "failed in its burden of proving any period of delay attributable solely to [Appellant] that is quantifiable in any particular number of days, such that the award of damages for sixty (60) days of compensable delay is not founded on the evidence[.]" Appellant's Brief at 6 (unnecessary capitalization omitted). Appellant says that, "[i]n order to recover for an alleged compensable delay, a contractor must prove: (1) the extent of the delay with a reasonable degree of accuracy; (2) the delay was caused solely [by] the [owner's] actions; and (3) the delay caused specific, quantifiable injury to the contractor." *Id.* at 42 (quoting *A.G. Cullen Const., Inc. v. State System of Higher Education*, 898 A.2d 1145, 1160 (Pa. Cmwlth. 2006), *disapproved of on other grounds by* *A. Scott Enterprises, Inc. v. City of Allentown*, 142 A.3d 779 (Pa. 2016) (citation omitted)).

Appellant complains that "nowhere in its [findings of fact and conclusions of law] or in its [o]pinion does the trial court analyze the facts and applicable law, 'connect the dots' by identifying a specific period of delay proven by Sciarretti with reasonable accuracy, find that the cause of that delay was solely the inexcusable actions or inactions of [Appellant] and no other cause, and then connect[] the dots to a specified, quantifiable injury flowing directly therefrom." *Id.* at 46-47. It raises various reasons to supports its

argument that, had the trial court conducted the proper analysis, it would have concluded that Sciarretti failed to prove a compensable construction delay, including that (i) there are no cases in Pennsylvania that recognize a cause of action for the recovery of damages for construction delays allegedly caused by a non-governmental project owner on a private construction project, *id.* at 39; (ii) the evidence Sciarretti proffered to support its claim that Appellant caused delays was anecdotal, very general, and void of detail, and Sciarretti made no attempt to identify any specific incident of delay, *id.* at 47; (iii) Sciarretti did not prove that Appellant's actions or inactions were the sole proximate cause of the delay and that no concurrent cause equally delayed the contract, specifically with respect to the trial court's finding that a compensable delay occurred because modifications were made to the building's design, and Appellant was slow to provide this information to Sciarretti, *id.* at 48-50[16]; (iv) the trial court erred in finding that the failure to

_____

[16] *See* Appellant's Brief at 49-50 ("While the trial court found that the delays associated with the discovery of the rock were not the fault of either party, it nonetheless utilized that delay in assigning its 60-day delay to [Appellant]. Significantly, while the trial court found that the rock required modification in the building design and that [Appellant's] 'slowness' in providing this information contributed to the '60 day' delay, it conducted absolutely no analysis whatsoever to determine whether this purported 'slowness' occurred separately or concurrently with excavating and removing the rock, or any other delay causing events that were occurring around the same time, such as the discovery and handling of large quantities of unsuitable materials, excessive rainfall, Sciarretti's failure to adequately staff the project, or some other cause. This, despite the trial court['s] specifically finding that all of those, with the exception of staffing, caused significant project delays that ran throughout the project, yet were causes that were not attributable to the fault
*(Footnote Continued Next Page)*

connect the roof drains to the drainage system contributed to the delay caused by Appellant, as the undisputed evidence showed that it was Sciarretti's obligation to connect the roof drains to the drainage system, *id.* at 50; (v) it is impossible under this trial record to determine with any degree of certainty any damages directly attributable to Appellant, *id.* at 50-51; and (vi) the trial court erred in including purported delays in non-critical path activities in its calculation of a 60-day delay, particularly with respect to Appellant's alleged delay in providing Sciarretti with information related to its installation of light pole bases, *id.* at 51.[17]

Initially, we deem waived Appellant's reasons for why the trial court should have concluded that Sciarretti failed to prove a compensable construction delay because of its vague, non-specific Rule 1925(b) statement. It is well-established that a Rule 1925(b) statement "shall concisely identify each error that the appellant intends to assert **with sufficient detail to**

_____

of either party and therefore not the basis of a delay claim.") (footnotes and citations omitted).

[17] **See** Appellant's Brief at 51 ("One item the trial court included in calculating its sixty days of project delay was [Appellant's] supposed delay in providing Sciarretti with information related to its installation of light pole bases. Yet Sciarretti admitted, through its expert, that any delay in providing information related to the light pole bases was not a critical path activity that delayed project completion.") (citations omitted); **see also id.** (explaining that "only delays that affected a critical path activity would cause a purportedly compensable delay. That is because if the critical path activity gets impacted or delayed, then the entire project gets delayed for the same period of time. On the other hand, if a non-critical path activity is delayed, the delay does not cause a corresponding delay in the critical path and, therefore, there is no delay in project completion").

- 32 -

*identify the issue to be raised for the judge.*" Pa.R.A.P. 1925(b)(4)(ii) (emphasis added). "Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived." Pa.R.A.P. 1925(b)(4)(vii).[18] Where an appellant's concise statement is not specific enough for the trial court to identify and address the issues the appellant seeks to raise on appeal, we may find waiver. *Commonwealth v. Reeves*, 907 A.2d 1, 2 (Pa. Super. 2006) ("[The a]ppellant's [c]oncise [s]tatement was not specific enough for the trial court to identify and address the issue [the a]ppellant wished to raise on appeal. As such, the court did not address it. Because [the a]ppellant's vague [c]oncise [s]tatement has hampered appellate review, it is waived.") (citations omitted).

Here, in its Rule 1925(b) statement, Appellant generally claimed that Sciarretti "failed in its burden of proving by a fair preponderance of the evidence that any quantifiable period of delay was attributable solely to [Appellant]. Accordingly, the trial court's award of damages for sixty (60) days of compensable delay is not adequately supported by the evidence." Pa.R.A.P. 1925(b) Statement, 7/7/22, at 4-5. Appellant did not specifically mention any of the reasons it now advances for why the trial court's finding

_____

[18] *See also Greater Erie Indus. Development Corp*, 88 A.3d at 225 ("[I]n determining whether an appellant has waived his issues on appeal based on non-compliance with Pa.R.A.P. 1925, it is the trial court's order that triggers an appellant's obligation[. T]herefore, we look first to the language of that order."); Pa.R.A.P. 1925(b) Order, 6/13/22, at 1 (warning that "[a]ny issue not properly included in the Statement timely filed and served shall be deemed waived").

was in error. **See** pages 30-32, **supra**. Consequently, the trial court did not address these particular claims in its Rule 1925(a) opinion. As such, our review is hampered, and we deem this claim waived on this basis.

Nevertheless, to the extent that Appellant argues that Sciarretti did not prove a compensable delay, we would still not grant relief, even on the limited record before us.[19] In its findings of fact and conclusions of law, the trial court explained its reasoning for determining that there was a 60-day delay, as follows:

> Sciarretti stipulates that its "claim for delay is based on the lack of timely directions and decisions of [Appellant's] handling project conditions; it is not a claim for delay based on the additional time to perform the work.["] Further, [Appellant's] lack of communication and its slow decision-making process and continuing change of plans did contribute to some delay on the completion of this project. There was a two[-]and[-a-]half month delay in [Appellant's] completion of its building. [Appellant] also made design changes to the building, including its location, that caused delays to some of the Phase III concrete work. The additional rain leaders that were added to the building and improperly laid on top of the parking lot caused damage to the subbase and created additional delay. Pl. Ex[h]. 104 p[.] 21. The delay of the construction of the building created workspace conflicts with some of the building contractors which caused delays to the concrete sidewalk installation around the building.
>
> Numerous instances of [Appellant's] altering its original plans[,] requiring design changes by the engineers or architects[,] were delayed in being provided to Sciarretti. Some of these delays include the plans and approval of PennDOT for handicap ramps and sidewalks at the intersection of Port Authority Way and University Blvd., and the change in location and design changes to the building requiring new layouts and elevations for the

---

[19] Even our reading of the trial transcript in this complex, fact-intensive case is affected by not having all the exhibits, as it has made it more difficult to follow along with, and understand, the testimony that was given.

building sidewalk. These delays were caused solely by [Appellant] or its subcontractors[,] which unnecessarily delayed Sciarretti's completion of the concrete work. Sciarretti was also delayed in the installation of the light pole bases in the parking lot areas due to [Appellant's] lack of directions and plans for its exterior lighting system. Sciarretti needed the light pole locations, elevations, circuit plan and the bolt patterns and bolts for the bases. The light pole bases were to be installed at the end of Phase II in September 2011, but [Appellant] delayed providing this information until at least March of 2012. *See* [N.T. at] 139-[]41[,] … 424-[]26; Pl. Exh. 51, 54, 61, 63, 66, and 78. Sciarretti's Expert opined that the concrete work was delayed approximately 30 days due to [Appellant's] providing piecemeal design change information[,] slowing the progress of the concrete installation. [N.T. at] 621-[]23[;] Pl. Ex[h.] 104.

***

Sciarretti was delayed 60 days by [Appellant's] numerous design changes that required new engineering and architectural plans. These numerous changes ultimately delayed Sciarretti's completion of the job as outlined above. Utilizing Sciarretti's Expert's Extended Equipment Cost Index (Pl. Ex[h.] 104 pp 31), the daily cost for Sciarretti's equipment was $3,516.00[.] Thus, Sciarretti's equipment costs due to 60 days of delay caused by [Appellant's] actions is $210,960.00. Sciarretti's equipment costs must be reduced because Sciarretti was previously reimbursed by [Appellant] for extended equipment use on all additional work paid for by [Appellant]. (Pl. Ex[h.] 104 pp 32-34). Thus, Sciarretti's total equipment cost for the duration of the delay caused by [Appellant] is $104,361.00. Sciarretti's other related delay damages[,] *e.g.*[,] extended project management and home office overhead[,] are found to be zero.

TCO I at 14-15, 16 (unpaginated; single citation and footnotes omitted).[20]

***See also*** TCO II at 6 ("I found by the preponderance of the evidence that

[Appellant] delayed Sciarretti at a minimum sixty (60) days.") (unpaginated).

_____

[20] Numerous exhibits mentioned by the trial court — namely, Exhibits 54, 61, 63, and 66 — are not identified in the table of contents for the materials attached to the parties' stipulation. Further, with respect to Exhibit 104, which
*(Footnote Continued Next Page)*

The record supports the trial court's findings of a compensable delay of at least 60 days. Viewing the record in the light most favorable to the victorious party below, we discern that Sciarretti showed at least a 60-day delay with a reasonable degree of accuracy. ***See A.G. Cullen Const., Inc.***, 898 A.2d at 1160 (stating that, as the first element, the contractor must prove "the extent of the delay with a reasonable degree of accuracy") (citation omitted); ***see also Beckwith Machinery Co.***, ***supra***.[21]

First, Sciarretti's expert — George Ellis — noted that it took Appellant an extra 70 days to construct the building. N.T. at 619. In his expert report, he stated that building construction occurred from September 22, 2011 through April 3, 2012. ***See*** Sciarretti's Pretrial Statement, 6/29/18, at attached Expert Report at 21.[22] Mr. Ellis explained that "[t]he logical start of

we glean is Sciarretti's expert report, it is likewise not identified in the table of contents for the materials attached to the parties' stipulation. However, in our review of the materials attached to the parties' stipulation, we discovered that Sciarretti's expert report, dated June 28, 2018, is contained therein as an attachment to Sciarretti's pretrial statement. In addition, at trial, Sciarretti's counsel stated that Sciarretti's expert report, dated June 28, 2018, "was also filed with our pretrial statement, so it's of record." N.T. at 608. By way of Sciarretti's pretrial statement, we were able to locate the report within the certified record.

[21] We assume, for the sake of argument, that the elements set forth in ***A.G. Cullen Const., Inc.*** apply, as Appellant contends. ***See Commonwealth v. Heredia***, 97 A.3d 392, 395 n.4 (Pa. Super. 2014) (recognizing that decisions of the Commonwealth Court are not binding on this Court, but may be looked at for their persuasive value) (citations omitted).

[22] Again, Mr. Ellis's report was introduced as Exhibit 104 at trial, but we were not provided with it. We rely on the copy of his report attached to Sciarretti's
*(Footnote Continued Next Page)*

Sciarretti's follow-on concrete work around the building was dependent upon the completion of building construction[,]" and that "[t]he extended time for building construction hampered Sciarretti's [p]roject activities due to a variety of impacts, including delayed subbase repairs, delayed start to building perimeter concrete activities, and restricted access for many of Sciarretti's noncritical concurrent activities." *Id.* at 21, 22.

Mr. Sciarretti and Michael Mehalic — Sciarretti's foreman on the project — corroborated that their work was delayed due to the extended construction time. *See* N.T. at 127 (Mr. Sciarretti's agreeing that the building needed to be completed to a point before Sciarretti could do the outside concrete work around it); *id.* at 419 (Mr. Mehalic's explaining that, after the building construction progressed, Sciarretti "had concrete work to do around the perimeter of the building. Mainly the front. We had water line to run up to the building, sewer to run up to the building, connect. Grading along the edge of the building, retaining wall"); *id.* at 421 (Mr. Mehalic's confirming that he needed to wait until the subcontractors removed their materials to do site work, as "[t]he front portion, eastern side, was mainly a lay down area for all the subcontractors that were working. So it was full of trailers, materials, equipment, lifts"); *id.* at 426 (Mr. Mehalic's remembering that he was delayed in installing the bioswale because the masonry contractor — one of the contractors constructing the building — was impeding his access to that area);

_____

pretrial statement, which is included in both the certified record and the parties' stipulation.

*id.* at 129 (Mr. Sciarretti's explaining that the subbase was destroyed; "[W]e had stoned in the front of the building[,] primarily all the parking lots, and they used them as a staging area. So they were driving their equipment, their loaders, their cranes and everything over the subbase. Well, the subbase was on fabric, and the subbase was only six inches thick. So when they would drive on it, they would rut it, and the … fabric would come up into the subbase elevation. Makes it nearly impossible to fix. So it was pretty much destroyed. It was contaminated. Every one of the dips, every one of the ruts held water. So now you have mud mixed in with stone. You have fabric that's up into the subbase elevation that needed to be pushed down, and you have rutting that's holding water");[23] *id.* at 872-73 (Mr. Sciarretti's asserting that the contaminated subbase affected the preparatory work for the concrete).

_____

[23] To the extent Appellant says it was Sciarretti's responsibility to connect the roof drains to the drainage system, Mr. Mehalic explained that the drawings only showed two roof leader connections, but more than two were added:

> Our drawings only showed, I think, two roof leader connections, which is the conductor pipe that takes all the rainwater from the roof of the building, either inside, outside the building, down to the ground level, and it has to be tied into the storm. There ended up being more than two of the connections, and the water had basically run from the building into the southern portion of that parking area and made everything soft. And with four or five, six other contractors on site building the building running through, it just destroyed it.

N.T. at 420; *see also id.* at 129-30 (Mr. Sciarretti's relaying that he "came back, and these guys were basically draining the entire roof surface right out across the parking lots"); *id.* at 330 (Mr. Sciarretti's stating that more rain leaders were added; "Somebody would have to tell me to take a pipe from this part and put it into this part. From the rain leader to this particular drain
*(Footnote Continued Next Page)*

Second, Mr. Ellis opined that Sciarretti's concrete work took 30 days longer than planned, from April 24, 2012 through June 18, 2012, largely because of piecemeal designs that were given to Sciarretti. *Id.* at 622-23. Again, the testimony of Mr. Sciarretti and Mr. Mehalic corroborate this delay. *See also id.* at 132-34 (Mr. Sciarretti's stating that Appellant shifted the footprint of the building and added an exterior door to it, which affected Sciarretti's concrete work; Mr. Sciarretti said he requested a drawing that showed how to make the corrections on April 12, 2012, and he received a response — which only provided some information — on April 25, 2012); *id.* at 423 (Mr. Mehalic's recalling that "there was a lack of information or delay with the ADA ramp at the corner of Port Authority Drive and University Boulevard. The configuration that was on the drawings that we had did not work"; "Until the answers came of how to put the ramp in, yeah. It couldn't be done"); *id.* at 118-21 (Mr. Sciarretti's testifying that, despite asking multiple times, he did not receive the necessary information to construct the handicap ramp until May 18, 2012); *id.* at 137-38 (Mr. Sciarretti's conveying that there were changes made to the entrance off of Port Authority Drive; the record suggests he did not get those changes until June 8, 2012); *id.* at 138 (Mr. Sciarretti's stating that he put the owner on notice that his concrete work

---

to that particular drain, tie it into another pipe…. I don't do design."). Given that Sciarretti was not made aware that more rain leaders were added, the record supports that it was not Sciarretti's fault that the subbase was ruined. In other words, Sciarretti cannot be faulted for failing to connect roof drains to the drainage system when it was not told about them.

around the building was being delayed). Based on the foregoing, there is competent evidence in the record to support the trial court's finding of at least a 60-day delay.

Viewing the record in the light most favorable to Sciarretti, there is also support for the trial court's finding that Appellant was the sole proximate cause of these delays. **See A.G. Cullen Const., Inc.**, 898 A.2d at 1160 (stating the second element the contractor must prove is that "the delay was caused solely by the [owner's] actions") (citation omitted); **see also id.** ("A contractor must show the [owner] was the sole proximate cause of the delay and no concurrent cause would have equally delayed the contract, regardless of the [owner's] action or inaction.") (cleaned up).

Here, the trial court found that "[t]here was a two-and-a-half month delay in the completion of the construction of the building because [Appellant] made changes to the building's location and added an extra garage door." TCO I at 6 (unpaginated). **See also** N.T. at 570 (Pat Cooper of Gateway Engineers conveying that, after some ground to the project opened up on the southerly property line, he suggested that Appellant "slide the building to the south ten or 12 feet" to "save some money"); **id.** at 591 (Mr. Cooper's recalling Appellant's adding a door); **id.** at 132-33 (Mr. Sciarretti's conveying that Appellant added another exterior door to the building and "it changed grades").[24] Further, the trial court credited Mr. Sciarretti's and Mr. Mehalic's

_____

[24] **See also** footnote 23, **supra** (explaining why the evidence supports that the contamination of the subbase was not Sciarretti's fault).

testimony that Appellant was slow to provide Sciarretti with new plans and information, which caused Sciarretti's concrete work to be delayed. TCO II at 7 (unpaginated); *see also* page 39-40, *supra*. To the extent Appellant suggests that the rock, unsuitable materials, weather, staffing shortages, etc., contributed to the delays found by the trial court, we remind Appellant that, in assessing the sufficiency of the evidence, "the evidence is viewed in the light most favorable to the victorious party below and all evidence and proper inferences favorable to that party must be taken as true and all unfavorable inferences rejected." *See Beckwith Machinery Co.*, *supra*.

Finally, the record supports that the delays caused specific, quantifiable injury to Sciarretti. *See A.G. Cullen Const., Inc.*, 898 A.2d at 1160 (providing that, as the third element, the contractor must prove that "the delay caused specific, quantifiable injury to the contractor") (citation omitted). Because the project was delayed by 60 days, Sciarretti asserted it had to pay for 60 more days of equipment. Sciarretti's expert — Mr. Ellis — provided information on Sciarretti's equipment costs in his expert report. *See* Sciarretti's Pretrial Statement at attached Expert Report at 31.[25] From this

_____

[25] Mr. Mehalic was also asked about a price sheet for equipment, which was marked as Exhibit 99. N.T. at 427. Mr. Mehalic testified that this equipment was on the site from beginning to end. *Id.*; *see also id.* at 500 (Mr. Mehalic's testifying that "[t]he equipment that was on the site is not something that you take home with you at night, like putting my hammer in my truck. … The equipment that's on site requires permits, special routes to haul things on 12, 14 feet wide, 100,000 pounds. Takes days to get permits and sometimes days to get it moved. You just don't pull it off the site for no reason."); *id.* at
*(Footnote Continued Next Page)*

information, the trial court determined that the daily equipment costs to Sciarretti amounted to $3,516.00, a figure that Appellant does not contest. After making appropriate deductions, the trial court concluded that the total equipment costs for the duration of the delay caused by Appellant amounted to $104,361.00, a figure that Appellant also does not contest. As such, the record contains evidence supporting that the delays caused specific, quantifiable injury to Sciarretti.

Based on the foregoing, even if not waived, we would deem the evidence sufficient to support the trial court's finding of a 60-day compensable delay. Furthermore, to the extent Appellant disagrees with our alternative analysis, we point out that our ability to award it relief on this issue is inhibited, as we do not have the whole record before us. With most of the trial exhibits missing, it would be difficult for us to definitively determine that the trial court's findings have no competent evidence to support them. **See Beckwith Machinery Co.**, **supra**. In sum, for the reasons set forth *supra*, no relief is due on Appellant's second issue.

### Issues 3 & 4

Finally, in Appellant's third and fourth issues, it challenges the trial court's award of statutory interest under CASPA for Sciarretti's claims pertaining to the outside sewage drop box connection and the increase in the

---

867-68 (Mr. Sciarretti's confirming that Sciarretti maintained its equipment on site). According to the table of contents for the materials attached to the stipulation, Exhibit 99 is not contained in the parties' stipulation; however, we believe it is attached to Sciarretti's expert report at Exhibit 18.

price of asphalt.[26]  With respect to the outside sewage drop, Appellant argues

that "the evidence clearly established that the costs associated with installing

an outside sewage drop, as opposed to an inside sewage drop, were incidental

to the [c]ontract and, thus, were subsumed within the [c]ontract [p]rice."

Appellant's Brief at 23-24.  Further, regarding the asphalt, Appellant asserts

that the contract "was silent as to which party should bear the increased cost

of the asphalt."  *Id.* at 24.  As such, Appellant says that Sciarretti should not

receive an award of interest under CASPA for these claims, as a successful

claim under CASPA must be predicated on a finding that Appellant breached

the contract, and the contract at issue here did not require Appellant to pay

anything more than the contract price for the incidental work associated with

the installation of the sewage drop or for the increased price of asphalt.  *Id.*

at 24, 38.

Here, the trial court explained why it awarded statutory interest under

CASPA for these claims, as follows:

> [Appellant] also contends that [the court] erred by awarding
> statutory interest under the provisions of CASPA for the outside
> drop box and the increased asphalt price.  CASPA provides in
> [S]ection 505(a) that, "[t]he owner shall pay the contractor
> strictly in accordance with the terms of the construction contract."

---

[26] We address Appellant's third and fourth issues together, as Appellant proffers no distinct argument for its fourth issue.  *See* Appellant's Brief at 38 (providing a two-sentence argument in support of its fourth issue; "For the same reasons, it was error for [the] trial court to award interest at the CASPA rate for the costs associated with the sewage drop and increased price of asphalt.  Since CASPA clearly does not apply to those claims, the trial court should have awarded interest at the legal rate provided by 42 Pa.C.S.[] § 8101.").

73 P.S.[] § 505. Under [S]ection 5.2 of the parties' construction contract, the [c]ontractor is permitted to submit change orders to modify the contract and[,] if accepted[,] they become part of the contract.[27]  Mr. Sciarretti testified that he submitted change orders for both the drop box sewage connection and the asphalt index increase[,] and [Appellant] denied payment.  Therefore, the question of whether the change order claims were valid and should be made part of the contract was an issue to be decided at trial.  Based on the preponderance of the evidence, [the court] found in favor of Sciarretti[] that the drop box and asphalt claims were made part of the contract through change orders, and [Appellant's] nonpayment was a default.  [The court] awarded $6,998.00 for the drop box and $15,365.00 for the asphalt price increase in my [n]on-[j]ury verdicts.  Since [the court] found that [Appellant's] nonpayment of the two change orders was a breach of contract, they were properly found to be CASPA claims.  [The court] correctly found that Sciarretti's claims for the outside drop box installation and asphalt index increase were part of its CASPA claim and therefore entitled to interest.

TCO II at 8 (unpaginated; internal citation omitted).

_____

[27] The parties' contract is contained in the certified record as an attachment to Mr. Ellis's expert report.  Section 5.2 states:

5.2 <u>Contractor's Changes.</u>  Before proceeding with any work involving possible claims by Contractor for extra compensation above the Contract Price, Contractor, within two (2) days of discovery of the event giving rise to potential claims, shall submit, in writing, to the Construction Manager, a request for an equitable adjustment, which request shall include a detailed estimate of the price of such work, and shall secure from the Construction Manager a Change Order as provided above.  Any such Change Orders are incorporated herein by reference and shall become a part of this Agreement.  Any claim for an extension of the Contract Time resulting from any such change must also be submitted and disposed of in like manner and in the same Change Order.

***See*** Sciarretti's Pretrial Statement at attached Expert Report at Exhibit 1, § 5.2.  The contract is also contained in the materials attached to the parties' stipulation.

The change orders submitted by Sciarretti for the outside sewage drop box connection (Exhibit 64) and asphalt price increase (Exhibit 96) were introduced at trial but we do not have them before us.[28] Nevertheless, no relief is due.

First, with respect to the outside sewage drop box connection, our review of the record supports the trial court's finding that it was not an incidental change and therefore not subsumed within the contract price. At trial, Mr. Sciarretti agreed that he had to comply with notes to project drawings, and that one such note stated: "Contractor is to work around existing utilities. If adjustments are necessary, work will be considered incidental." *See* N.T. at 315, 862.[29] Mr. Sciarretti described the issue with the sewage drop box as follows:

_____

[28] They are not contained in the materials attached to the parties' stipulation according to the table of contents.

[29] At trial, the following exchange occurred regarding this note:

> [Appellant's counsel:] How about this one? Contractor is to work around existing utilities. If adjustments are necessary, work will be considered incidental. Work will be considered incidental. Would you tell the [c]ourt what that language means to you?

> [Mr. Sciarretti:] It's exactly what it says. We have to work around utilities, and we have to make small adjustments or it's incidental.

> [Appellant's counsel:] If you have to make adjustments because of a water line or force main or something else, you're supposed to make them, and you cannot call that an occasion necessitating a design change; is that correct?

*(Footnote Continued Next Page)*

[Sciarretti's counsel:] Talk about the sewer line connection?

[Sciarretti:] Sure.

[Sciarretti's counsel:] Does that show this profile of the sanitary line that needed to be installed?

[Sciarretti:] Yes, it does.

[Sciarretti's counsel:] Does that drawing also indicate the type of connection to be made to the manhole?

[Sciarretti:] Yes, it does.

[Sciarretti's counsel:] What does it say?

[Sciarretti:] Break-in, flow line, 1161 inside drop.

[Sciarretti's counsel:] What's an inside drop?

[Sciarretti:] That's when you core drill a hole through the manhole, put a boot in and put your pipe down inside the manhole to within, you know, six to eight inches of the bottom of the manhole.

[Sciarretti's counsel:] It tells you to break in, correct?

[Sciarretti:] Yes.

[Sciarretti's counsel:] Doesn't tell you to core?

[Sciarretti:] No.

*** 

---

[Mr. Sciarretti:] Yeah.  If there's a design change, I'm not -- that doesn't fall under my responsibility to redesign.

[Appellant's counsel:] I understand.  But when it says you have to work around utilities, and if it requires an adjustment, it's incidental.  That's on you, isn't it?

[Mr. Sciarretti:] If it's incidental, yes, it is.  If it's a redesign, no, it isn't.

N.T. at 315-16.

[Sciarretti's counsel:] … Can you go to Exhibit 50?[30]

[Sciarretti:] Provides grade on the lateral.

[Sciarretti's counsel:] For the sewer line?

[Sciarretti:] For the sewer line, yes.

[Sciarretti's counsel:] What are they changing?

[Sciarretti:] They are changing the percentage of fall.

[Sciarretti's counsel:] Does that drawing that's attached to Exhibit 50 still indicate that it's an inside drop?

[Sciarretti:] Yes, it does.

[Sciarretti's counsel:] During the performance of your work, were you told at some point to hold off on making this sanitary line connection?

[Sciarretti:] Yes.

[Sciarretti's counsel:] By whom?

[Sciarretti:] Probably Tony [Ross].

[Sciarretti's counsel:] Why?

[Sciarretti:] They needed to run a 12-inch water line down University Boulevard.

[Sciarretti's counsel:] Who is they?

[Sciarretti:] The Municipal Authority of Moon.

[Sciarretti's counsel:] So why did you have to wait for that?

[Sciarretti:] It interfered with the rest of the utilities, tie ins.

[Sciarretti's counsel:] Do you recall when this line got installed?

[Sciarretti:] I do not.

[Sciarretti's counsel:] So you now have a revised drawing, plus the contract drawing.  Before installation, what did you do?

---

[30] Exhibit 50 is not attached to the parties' stipulation according to the table of contents.

[Sciarretti:] They had to actually do it again. We went and we were able to locate an existing hole in the manhole, and we were going to try to use that hole, and we were not able to get the proper angle that was able to go between the other -- existing utilities, which is the water line and the gas line and whatever else is on University Boulevard. That pipe needed to literally thread through that and hit that hole.

[Sciarretti's counsel:] Did you review what you planned to install with the township?

[Sciarretti:] Yes, we did.

[Sciarretti's counsel:] Was there a meeting held on site?

[Sciarretti:] There was a meeting, yes.

[Sciarretti's counsel:] Did you describe to the township what you were planning on doing?

[Sciarretti:] I not only described it, but I got permission to do it.

[Sciarretti's counsel:] What did you get permission to do?

[Sciarretti:] We got permission to remove the existing pipe and then rather than break in or core, we were going to use an existing hole. And so we were coming some couple hundred feet, 200, 300 feet, and we were going to try to hit that hole.

[Sciarretti's counsel:] Did you hit the hole?

[Sciarretti:] We missed it by three-quarters of an inch.

[Sciarretti's counsel:] So what did you do?

[Sciarretti:] So we had to chip a little bit of the concrete to actually allow the pipe to go through. We had a four-inch hole. We made a four[-]and[-]a[-]half inch hole.

[Sciarretti's counsel:] Was the work ultimately accepted by the municipality?

[Sciarretti:] It was rejected.

[Sciarretti's counsel:] Why?

[Sciarretti:] Because they did not want us to break into the box. That's considered breaking in.

[Sciarretti's counsel:] Does your contract drawing tell you to break in?

[Sciarretti:] Yes.

[Sciarretti's counsel:] What ultimately was done?

[Sciarretti:] ***We had to put an outside drop in. An outside drop is a lot more time and a lot more expensive. We had to do a redesign to make sure -- to get the pipe to come through the utilities that were perpendicular to it going down University Boulevard, and then we needed to get duct wire and pipe, and we needed to encase it in concrete, and we needed to do the drop on the outside of the manhole and then go in and penetrate the bottom of the manhole, and that[] ultimately ended up happening. That drawing was given to me by Deborah Walker[, the director of engineering for the Moon Township Municipal Authority]. These guys knew it.***

N.T. Trial at 122-26 (emphasis added).

In addition, Mr. Cooper of Gateway Engineers testified to the following:

[Sciarretti's counsel:] Note No. 9. Contractor to work around existing utilities. If adjustments are necessary, work will be considered incidental.

[Mr. Cooper:] Yes.

[Sciarretti's counsel:] Meaning no matter what I do, I have to avoid utilities. Meaning the contractor.

[Mr. Cooper:] No. If adjustments are made, it's not an avoidance thing, but if adjustments are made, let's say a sewer was ten feet deeper or five feet deeper than we thought from the information available, you have to connect to the right point. Something like that.

[Sciarretti's counsel:] It deals with the connections --

[Mr. Cooper:] Or --

[Sciarretti's counsel:] -- to those utilities?

[Mr. Cooper:] Or working in and around them.

[Sciarretti's counsel:] Does it relate to kind of redesigning of the project in the event of that type of conflict?

[Mr. Cooper:] No.

[Sciarretti's counsel:] So that if redesign was necessary, then that would be outside the scope of the contract note?

[Mr. Cooper:] From where I sit, yes.

\*\*\*

[Sciarretti's counsel:] And then as a result of the authority's rejection of the connection, they required the installation of an outside drop?

[Mr. Cooper:] Correct.

[Sciarretti's counsel:] Is an outside drop a more difficult connection to make?

[Mr. Cooper:] I think so.  I'm not a contractor.  But I think there's more to it.

[Sciarretti's counsel:] What do you understand to be more to it?

[Mr. Cooper:] I think there's actually two openings in the manhole.  One for clean out, but I'm not -- I really can't comment on --

[Sciarretti's counsel:] That's fine.  Would you consider the change from an inside drop to an outside drop an incidental modification?

[Mr. Cooper:] I can't make judgment.

[Sciarretti's counsel:] You were the --

[Mr. Cooper:] It's totally different.

[Sciarretti's counsel:] Totally different?

[Mr. Cooper:] Yeah.

N.T. at 1127-28, 1145-46.

Based on the foregoing, we determine that the record supports the trial court's finding that the outside drop box sewage connection was not an adjustment or incidental change.  Mr. Sciarretti testified that the change to an

outside connection was not incidental, but a redesign that required much more time and expense. Mr. Cooper corroborated that it is a more difficult connection to make. As such, we decline to disturb the trial court's finding that the outside sewage drop box connection was not an incidental change and that, as such, Sciarretti's change order was valid.[31] As such, Sciarretti is due statutory interest on this claim under CASPA.

Second, regarding the asphalt index claim, the trial court stated, as follows:

> Sciarretti is entitled to be paid $15,365.50 for the increase in the cost of asphalt that it incurred. Sciarretti's original contract price for paving was based on the 2011 cost of asphalt which was the paving season the parties had anticipated in their contract. As already found, the delay caused by the discovery of the rock and extraordinary amounts of unsuitable material resulted in the delay of the progress of the overall project and pushed the paving portion into the 2012 season. Acknowledging that the contract is silent as to asphalt cost escalation[,] the court finds it equitable to award these damages as these delays were not anticipated by either party. Sciarretti should not be required to absorb increased costs for asphalt for delays it had no control over.

TCO I at 15-16 (unpaginated).

Appellant argues that there was no basis in the contract for the trial court to award asphalt escalation costs. It says that, "[r]emarkably, despite having no basis in the [c]ontract, the trial court … found that [Appellant's]

---

[31] Appellant does not challenge the trial court's finding that Appellant breached the contract by rejecting Sciarretti's change order for the outside sewage drop box connection under Section 5.2 of the contract. Instead, as discussed *supra*, Appellant only argues that the outside sewage drop box was an incidental change, which did not require Appellant to pay anything more than the contract price, and that therefore Appellant did not breach the contract by not paying Sciarretti for its work on the outside sewage drop box.

refusal [to] pay what the trial court felt was equitable amounted to a violation of CASPA and awarded Sciarretti CASPA interest in the amount of $16,595.88." Appellant's Brief at 37-38. However, Appellant overlooks that the trial court did point to a basis in the contract — Section 5.2, *i.e.*, the change order provision. **See** TCO II at 8 (quoted *supra*; unpaginated). This provision allows for Sciarretti to request an equitable adjustment and seek additional compensation. **See** footnote 27, **supra**. The trial court determined that Appellant should have granted Sciarretti's change order for the increased asphalt costs under Section 5.2 of the contract but failed to do so. Appellant does not address Section 5.2 at all, and we decline to craft an analysis of that provision on Appellant's behalf. **Commonwealth v. Hardy**, 918 A.2d 766, 771 (Pa. Super. 2007) ("When briefing the various issues that have been preserved, it is an appellant's duty to present arguments that are sufficiently developed for our review. … This Court will not act as counsel and will not develop arguments on behalf of an appellant. Moreover, when defects in a brief impede our ability to conduct meaningful appellate review, we may … find certain issues to be waived.") (citations omitted). As such, Appellant fails to convince us that the trial court erred in finding that Appellant breached the contract by rejecting Sciarretti's change order for the asphalt price increase and thereby awarding Sciarretti statutory interest under CASPA.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 03/25/2024